**WALDIE v. STEERS SAND & GRAVEL CORPORATION et al.**

No. 327.

Circuit Court of Appeals, Second Circuit.

June 8, 1945.

On Rehearing July 13, 1945.

Stanley R. Wright, of New York City, for Red Star Towing & Transportation Co.

Edmund F. Lamb, of New York City, for Steers Sand & Gravel Co.

Joseph F. Murray, of New York City, for Standard Surety & Casualty Co.

Leo F. Hanan, of New York City, for Susanna E. Waldie.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The Red Star Towing and Transportation Company and the Steers Sand and Gravel Corporation appeal from a decree in the admiralty, which held the Red Star Company primarily, and the Steers Company secondarily, liable for damage to the libellant's barge, caused by resting upon the uneven bottom of a berth alongside a wharf at Fort Slocum. The libellant sued the Steers Company as charterer of the barge; and the Steers Company impleaded the tug, which delivered the barge at the wharf, the consignee* of the barge's cargo, which directed delivery at the wharf, and th which directed delivery at the wharf, and the surety of the consignee—the last on the theory that the surety had taken over the consignee's contract with the War Department. The facts as found were as follows. The libellant chartered the barge to the Steers Company, and the charterer loaded her on May 15th at North Port, and left her at its stakeboat off Whitestone on the 17th. It then arranged with the Red Star Towing and Transportation Company to tow her to the wharf at Fort Slocum; and that company sent its tug, "Portchester," to do the job. The tug took her in tow, and on the night of the 17th left her on the north side of the wharf in question, bows in, abreast of a coal derrick. Before doing so, the tug captain inquired of a military policeman, on duty at the wharf, whether the barge was "all right here," and was assured that she was. The captain then told the bargee to make fast, so that the barge would drift off some four or five feet from the side of the wharf at low water, and left after the bargee had done so. On the fall of the tide the barge's bows took the ground upon a shoal and she suffered the damage for which the suit was brought. The tug captain testified that for twenty years he had been placing coal boats and "trap rock scows" at this pier in the same place; that they had never been damaged, and that he had never heard of any damage; and in this he was confirmed by an apparently disinterested witness. The judge held the tug at fault because the captain had relied upon his own knowledge of the waters, and had not sounded before mooring the barge; and that the presence of the derrick, abreast of where he left her, was not sufficient assurance that the berth was safe. He exonerated the contractor's surety on the ground that it had not taken over the performance of the contract.

■ The books contain a good deal of discussion as to the duties of wharfingers, consignees and tugs towards barges, damaged by unknown boulders, piles, shoals or other obstructions in the bottom of berths at which they are moored. Panama R. Co. v. Napier Shipping Co., 166 U.S. 280, 17 S.Ct. 572, 41 L.Ed. 1004, is to be set down rather as a case where the wharfinger actually knew that the berth was foul; but in Smith v. Burnett, 1898, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756, the court rested liability upon the failure of the respondent, at once the consignee and the wharfinger, to acquaint itself with the berth. For this it relied for the most part upon English and state cases; but laid down no more specific principle than that the care must be that called for by all the circumstances. Already in 1880 Judge Choate had exonerated a tug because "reasonable care" did not include acquaintance with the bottom, Powell v. The Willie, D.C., 2 F. 95 (affirmed by Blatchford J. on the opinion below in C.C.N.Y., 8 F. 768); and we have often held or implied, that the liability of wharfingers, consignees, or tugs, is to exercise "reasonable care," and is to be determined in each situation by balancing the risks imposed upon others by not taking precautions against the cost and trouble of the precautions. In short we have treated the situation as an ordinary case of "negligence." Schoonmaker v. City of New York, 2 Cir., 167 F. 975; Stevens v. Maritime Warehouse Co., 2 Cir., 263 F. 68; The W. H. Baldwin, 2 Cir., 271 F. 411; M. & J. Tracy Inc. v. Marks, Lissberger & Son, 2 Cir., 283 F. 100; Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 48 F.2d 105; The Gildersleeve, 2 Cir., 68 F.2d 845; Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 135 F.2d 443. See also Atlantic & Gulf Shipping Co. v. Marine Contracting & Towing Co., 5 Cir., 26 F.2d 70. We do not mean that this results in imposing the same degree of care upon all three classes; for example, as Hough J. indicated in M. & J. Tracy Inc. v. Marks, Lissberger & Son, supra, 283 F. 100 at page 102 the reputation of a wharf may excuse a consignee, and a fortiori a tug, though it would not excuse a wharfinger. A wharfinger invites vessels to use his wharf and induces them to suppose that all berths are safe:

---

* Sol Lustbader, Inc., impleaded as a party, but never served.

if he has not exercised care to see that they are, he exposes them to a risk which they have no reason to anticipate. A consignee also invites a barge to use the wharf, when he asks it to deliver goods there; and if he has been using it for a long time, his invitation may induce as much reliance as a wharfinger's, though not if he is using the wharf for that single occasion; the degree of precaution expected of him may well be deemed to depend upon the permanency of his use. But a tug will rarely, if ever, be in his position; she must ply her trade all over the harbor, and there is ordinarily no warrant, either in principle or authority, for requiring her to sound at each wharf where she delivers a barge. She is indeed to be held for such information as is current in the calling; and if the wharf has a bad name, she should know it; that would be a factor in establishing her liability. But it must be remembered that she is not a bailee of the tow, and that the tow must always establish her fault. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. In the case at bar the libellant did not show anything whatever to charge her; on the contrary it was the tug that proved in exoneration that the wharf did have a good reputation—something which she need not have done. The captain's inquiry of the military policeman did indeed show that he was not relying entirely upon his earlier acquaintance with the wharf; but it should not charge the tug that he went further than he need have gone. Since nothing was shown against her, the tug should therefore have been exonerated. Procedurally, the situation was different as to the charterer, who was a bailee and against whom the libellant made a good prima facie case by showing a return of the barge in a damaged condition. But the charterer affirmatively established its excuse, when it showed that the tug delivered the barge at the place where the consignee directed it to be delivered; that she had no reason to suspect that all the berths at the wharf were not fair; that she inquired of one who was apparently in charge and would be likely to know; and that, quite independently, information derived from her own past experience assured her that the wharf was safe. Hence the charterer also should have been exonerated.

■ As we have already indicated, it does not follow that the contractor, as consignee, should also have been exonerated. It had been at work on the Fort Slocum job for about a month, although the record does not show whether during that time other barges had been moored at the wharf, or where they had been berthed. On the other hand, the bargee swore that the shoal was actually exposed at low water, and his is the only testimony on the point. We should hesitate to exculpate a consignee who directed barges to such a wharf without warning them that part of what at high water seemed a fair berth was in fact a foul one. There could be no question of his liability, if the consignee actually knew this; and, if he had been using such a wharf for a month, it is at least extremely doubtful whether he would not be charged with notice of so recurrent and open a danger. The judge made no finding upon this issue, because he held that in any event the contractor's surety had not taken over performance of the contract; and we agree, although the evidence is not wholly free from doubt. When it became obvious that the contractor was in danger of defaulting, the surety was willing to make further advances, provided it could be properly secured; and the parties therefore arranged that all money received by the contractor should be put within the surety's control. As part of that plan the contractor agreed that the surety might install an engineer, McClary, retained by the surety, whom the parties in the contract "designated * * * to supervise and to have full charge and control of the Contract." His "decisions" were to be "binding on the parties in so far as the Contract, the procedure for carrying the same on and the payments to be made thereunder are concerned." It must be owned that, if nothing more had appeared, this language might have been enough to charge the surety as the party in charge of the work; but more did appear. The contractor's president testified that, at the time in question, the contractor had employed one, Moore, as "superintendent of the job" —later succeeded by one, Hillary—and that McClary never gave "directions as to the doing of the work," or made any contracts or ordered any materials. The surety was certainly not the contractor's partner (Martin v. Peyton, 246 N.Y. 213, 158 N.E. 77); nor was the contract all that determined their relations. If McClary—no matter how the contract described his powers—in fact did not have charge of the

work, but it was left in the hands of Moore, the surety should not be charged. Plainly, the only purpose was to protect the loans, and it would impute to the parties an improbable intent to hold that, as an incident, the surety meant to make itself generally liable under the contract. Indeed, that is just what it meant not to do. Since it was not liable, it is unnecessary to decide whether the contractor was liable as consignee; or whether the United States as wharfinger would have been liable, if it could have been sued. Of the parties in fact before us none are liable to the libellant.

Decree reversed; libel dismissed as against all the respondents.

### On Petition for Rehearing.

PER CURIAM.

■■ The libellant petitions for a rehearing of so much of our original disposition of this appeal as dismissed her libel against the charterer, to which, she argues, any negligence of the consignee is to be imputed. So far the charterer agrees; and, indeed, we have just so decided in O'Donnell Transportation Co. Inc. v. M. & J. Tracy, Inc., 150 F.2d 735. But the charterer replies that the libellant did not prove the consignee negligent in offering the berth to the barge, and that, since it—the charterer—proved how the loss had happened, and offered evidence in exculpation of the consignee, the libellant lost any advantage arising from the original presumption against the charterer, as such; and did not carry the burden of proof on the issue. The judge made no finding as to the consignee's negligence, and the question was probably not tried out as fully as it would have been, had it then been supposed to be crucial. Now that our reversal of the decree against the tug has made it so, it seems to us equitable not to dismiss the libel as against the charterer on this record; but to remand the cause for further trial, though between these two parties only.

■ Upon that trial, for the reasons just given, the charterer will be free of any presumption, and the libellant will have the burden of proof; furthermore we do not regard the issue as foreclosed upon the present record. We did indeed say that, if the consignee had been using the wharf for a month, we should hesitate to hold that it would not be charged with notice that part of the bottom alongside was exposed at low water, and with the duty of warning barges of that fact. However, it is to be remembered that only the bargee so testified, and, moreover, that, according to him, at the actual berth where the barge lay, her bows were thirty feet or more outside the exposed shoal. How far the existence of the shoal where he placed it would impose a duty upon the consignee to give any warning whatever to barges which moored where the libellant's barge was made fast, is another matter, about which we do not express any opinion.

The libel against the charterer will not be dismissed, but the cause will be remanded for trial between the libellant and the charterer upon the issue of the consignees negligence.