## PUGET SOUND TUG & BARGE CO. v. OLYMPIC FOREST PRODUCTS CO.

### No. 13914.

District Court, W. D. Washington, N. D.

Dec. 10, 1937.

Wright, Jones & Bronson, of Seattle, Wash., for libelant.

Derby, Sharp, Quinby & Tweedt, of San Francisco, Cal., and Hayden, Merritt, Summers & Bucey, of Seattle, Wash., for respondent.

NETERER, District Judge.

Libelant seeks to recover as charterer and owner pro hac vice as between respondent and libelant the necessary expenditure for repairs of the D. I. Co. No. 48 barge (White v. Upper Hudson Stone Co., 2 Cir., 248 F. 893; Gannon v. Consolidated Ice Co., 2 Cir., 91 F. 539) for damages sustained by failure of respondent to discharge its duty, in that it failed to properly moor and safely secure the said barge when left at its dock, after discharge of cargo. The barge is 110 feet long, 36-foot beam, 9-foot depth of hold, and covering nearly the entire deck was a "hog fuel" box 12 feet high. The top of the pier is about 10 feet about high tide; between the place where the barge was moored and the windward side of the dock extra piling was driven to strengthen the wharf. There is approximately a 9-foot tide at this place. The tide was about one-half flood. The wharf extends north from the south shore about 1,000 feet, and is from

200 feet to 400 feet wide. The barge was moored near the unloading crane on the west side and inshore end of the wharf. The smoke house (S.H. on exhibit) is 150 feet from the barge fully exposed to the wind. It is about 15 or 18 feet high covered with a composition paper roof. This roof was removed by the united action of spray from the waves striking against the rock bulkhead below and the wind. No damage is shown to other structures.

until one of the strands broke, then the broken strand was cut out, and the worn five strands were used.

Nor was effort made to secure the barge against wind and wave when danger was apparent, either by the use of more lines which were available, or by removal of the barge to a safer place, tugs being at hand. There is testimony that two 9-inch manila ropes were used which were practically new (having been purchased the pre-

The proof shows that respondent did assume to moor the barge, and conduct the shifting and mooring, and it was its duty to see that sufficient lines were used after the mooring and that the lines were properly and sufficiently adjusted and fastened. For this duty it is charged to exercise reasonable and ordinary care—such a degree of care as should reasonably be expected from an ordinarily prudent person under similar circumstances. 45 C.J. 683. In this respondent failed, in that the lines were not properly adjusted. The lines were placed in three classes: (1) Barge's lines were placed about the piling of the dock; (2) the manila ropes were placed to function when the barge's lines failed; (3) the wire cable was placed to function when the manila rope failed. Such placement of lines is not good seamanship. It should also be said that the six-strand wire cable was old, had been used

ceding October and used January 4th.) The physical facts do not sustain this claim; one end of the barge broke away and swung into the open water held by the rope fastened to the other end of the barge until rope broke. After the barge broke away only one Manilla rope was seen. If a line had been on the other end of the barge it would have been present; the separated lines were not produced at trial. This is strong circumstantial evidence against the condition of the line; and only one line being seen is conclusive that only one line was used. Physical facts outweigh verbal declaration. No satisfactory excuse is given for failure to produce the broken lines. Ordinary and reasonable care in mooring the barge was not exercised. M. & J. Tracy v. Marks, etc., 2 Cir., 283 F. 100, 102; Kohlsaat v. Parkersburg, etc., Sand Co., 4 Cir., 266 F. 283, 285, 11 A.L.R. 686.

■ The doctrine of res ipsa loquitur has no application here since negligence from all the evidence is clearly obvious.

■ The defense vis major is not sustained. The testimony of respondent's witnesses is not in harmony and is not convincing as to the force of the wind; the evidence carefully weighed shows that for many years at the place in issue similar stress of northerly winds occurred three or four times every winter for many years. Nor did the watchman "look, think or act." The President Madison, D. C., 13 F.Supp. 692. It is shown that the Weather Bureau Observer for many years regularly employed before the station was officially discontinued at Port Angeles, now a volunteer at the bureau, did post storm warnings; and did display a storm warning flag during the daytime of January 4th, and warning light signals during the night of January 4th and 5th. This was done for many hours preceding the breaking away of the barge in issue. The log of the same bureau records the wind velocity for the same period January 4th, at 4 a. m. N. W. 30 miles; at 5 a. m. N. W. 25 miles; 6 a. m. N. N. W. 25 miles; 7 a. m. W. N. W. 27 miles; 1 p. m. S. W. 25 miles; 10 p. m. N. E. 27 miles; January 5th, 4 a. m. N. E. 25 miles; 5 a. m. N. E. 20 miles. The log of United States Coast Guard, Port Angeles station, among other things records the direction and force of the wind from 7 p. m. to 12 p. m. for the respective hours: N. N. E., N. E., N. E., N. E., N. E.; and the force at 13.10.20, 27.14.18. The barometer heights in inches is shown for the same hours, respectively; 2948, 2950, 2955, 2957, 2960, 2963. It was known to the yard foreman whose duty it was "to see that the barges are moored and fastened," who for "over seven years experience" knew a northeast wind with an incoming tide made a "very bad swell." The barge was moored on the leeward side of the wharf, and it was protected from the direct force of wind by the wharf and structure upon the wharf. The forest of piling driven to strengthen the dock to the windward from the barge impeded the force of the swell of the water and lessened the stress on the mooring lines. The fact that the piling under the pipe line, and the piling under the Milwaukee wharf one and one-half miles away, was damaged by floating logs is unimportant upon this issue, since floating logs from a broken boom of logs in tow, or at anchor, upon breaking would necessarily injure piling driven into the water, irrespective of a gale or unusual high wind.

■ There is no evidence of broken boom of logs; but it is common knowledge that logs are towed in this water, and booms of logs anchored in nearby zones.

There is no comparison in the force of the wind and wave and exposure in The President Madison, supra, where The President Madison, whose sun deck was at a height 52.9 feet above the pier; the force of the wind ranged from 26 miles to a whole gale (75 Miles) within six hours; and better seamanship was exercised in the mooring of the President Madison than in the instant case, but the court held due diligence was not exercised.

■ The libelant should recover the amount necessarily expended, and further necessary expenditures, to put the barge in its former condition. The court required proof of the expenditures necessarily made in repairing the barge. It reserved its ruling upon the offer of the competitive bids received for the repair of the barge. I think after it is shown what was actually expended for labor and material in the shipyard of the libelant, that it is entitled to recover, in addition to the amount necessarily expended, the necessary overhead expense such as housing, tools, supervision, etc. This has been testified at various per cent. (15 per cent. to 25 per cent.) of the amount necessarily expended, and the further expenditure necessary to be expended to make the barge whole.

I think, after receiving the testimony of the actual necessary expenditures, that the objection to the offer of the bids should be denied and the bids admitted in evidence. The testimony received fully sustains the offer of the lowest bid which the court finds is the reasonable necessary expenditure.

It is therefore concluded that the libelant recover from the respondent the total amount of the lowest bid received, $6,959, together with the other items set out in Exhibit A attached to the libel, with the demurrage of $12 per day for thirty days in which the repairs could have been made by the shipbuilding concern submitting the bid.

This memorandum will be the court's findings and conclusions, unless proposed findings are served on opposing proctors and presented to the court within ten days. A judgment and decree for libelant may accordingly be entered.